# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BRIAN COURTNEY,

     *Plaintiff*,

*v.*

PRISON HEALTH SERVICES,
*et al.*,

     *Defendants*.

_____/

CASE NO. 10-CV-14123

DISTRICT JUDGE MARK A. GOLDSMITH
MAGISTRATE JUDGE CHARLES E. BINDER

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS MICHIGAN DEPARTMENT OF CORRECTIONS, CARUSO, SCUTT, McMILLAN, MURPHY, AND HAMBLIN'S MOTION FOR DISMISSAL AND/OR SUMMARY JUDGMENT
(Doc. 18)

## I. RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' motion be **GRANTED**.

## II. REPORT

### A. Introduction

By order of U.S. District Judge Mark A. Goldsmith, this prisoner civil rights action was referred to the undersigned magistrate judge for general case management pursuant to 28 U.S.C. § 636(b). (Doc. 9.) Plaintiff Brian Courtney is an inmate in the custody of the Michigan Department of Corrections ("MDOC"), who is currently incarcerated at the Lakeland Correctional Facility in Coldwater, Michigan. Plaintiff's *pro se* complaint, brought under 42 U.S.C. § 1983, alleges that Plaintiff's Eighth Amendment right to not have his serious medical needs met with

deliberate indifference was violated by numerous defendants when Plaintiff was incarcerated at the MDOC's G. Robert Cotton Correctional Facility ("JCF").

The Complaint is 114 pages in length with an additional 202 pages of exhibits; it sets forth 13 causes of action. Plaintiff states that he suffers from pinched nerves, pain and numbness in his arms and fingertips, twitching in his right arm, pain from his knee to the bottom of his foot, internal bleeding, pressure in his stomach, past heart attacks, past loss of consciousness, heart arrhythmia, ripping and bleeding skin, and continuous severe pain. (Courtney Aff., Compl., Doc. 1 at 115-16.) Plaintiff's claims stem from the allegation that when Prison Health Services ("PHS") took over from Correctional Medical Services as the contractor for inmate medical care in Michigan prisons, his "previous treatments and scheduled tests were stopped, and all appointments for treatment and surgeries were now denied, [and] all medications were stopped and denied, unless approved by" PHS. (Compl., Doc. 1 at 19 ¶ 18 (misspellings corrected).)

Before the Court is the above-entitled dispositive motion brought by six of the eleven named defendants, all of whom are employees of the MDOC: Patricia Caruso (Director of the MDOC), Debra Scutt (Warden of JCF), Larry McMillan (Grievance Coordinator at JCF), Cyndi Murphy (Nurse at JCF), and Karen Hamblin (Nurse at JCF). (Doc. 18.) The MDOC Defendants filed under seal 493 pages of exhibits in support of their motion. (Doc. 19.) Plaintiff filed a response to the motion (Doc. 28) with exhibits (Doc. 30) and a supplemental response. (Doc. 35.[1]) Having reviewed the briefs and exhibits, the court concludes that a hearing on the motion is

---

[1]As previously noted, Docket #35, which Plaintiff entitled "Motion to Amend Plaintiff's Opposition to Defendant's Motion for Dismissal/Summary Judgment/Dispositive Motion," is being construed as a supplemental response, since there is no provision in the federal rules allowing for the "amendment" of a previously-filed response (Doc. 28).

unnecessary. *See* E.D. Mich. LR 7.1(f)(2). Accordingly, the motion is ready for Report and Recommendation.

### B. Motion Standards

### 1. Motion to Dismiss Pursuant to Rule 12(b)(6)

When deciding a motion to dismiss, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001). As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), a complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570 (rejecting the traditional Rule 12(b)(6) standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

Where a plaintiff is proceeding without the assistance of counsel, the court is required to liberally construe the complaint and hold it to a less stringent standard than a similar pleading drafted by an attorney. *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972); *Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999). However, courts may not "rewrite"

3

a complaint to include claims that were never presented, *Barnett v. Hargett*, 174 F.3d 1128 (10th Cir. 1999), nor may courts construct the plaintiff's legal arguments for him. *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993). Courts are not to "conjure up unpled allegations," *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979), or to identify a claim not alleged in the complaint, *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975), because to hold otherwise would require the court "to explore exhaustively all potential claims of a *pro se* plaintiff, [and] would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

The elements of a claim under 42 U.S.C. § 1983 are: (1) the violation of a right secured by the federal Constitution or federal law that was (2) committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).

### 2.    Motion for Summary Judgment Pursuant to Rule 56(c)

A motion for summary judgment will be granted under Rule 56(c) where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's

evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

C.      **Analysis & Conclusions**

1.      **Official Capacity Claims**

5

Defendants Caruso, Scutt, McMillan, Murphy and Hamblin contend that all claims asserted against them in their official capacities are barred by Eleventh Amendment immunity. (Doc. 18 at 2.) I suggest that Defendants are correct. A lawsuit "against a governmental officer 'in his official capacity' is the same as a suit against the entity of which the officer is an agent." *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 785 n.2, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997) (internal quotations and citations omitted). Therefore, suing these MDOC employees in their official capacities is the same as suing the State of Michigan.

The law is clear, however, that regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts if the state has not waived immunity and Congress has not expressly abrogated Eleventh Amendment immunity by statute. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 57 L. Ed. 2d 1114 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993). Since Congress has not abrogated Eleventh Amendment immunity by statute or expressly in § 1983, *Hutzell v. Sayre*, 5 F.3d 996, 999 (6th Cir. 1993), and Michigan has not consented to suit, *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004), I suggest that the claims against the state-employee defendants in their official capacities are barred by Eleventh Amendment immunity and therefore should be dismissed from this case.

## 2.    Defendant Michigan Department of Corrections

I further suggest that Defendant MDOC's motion to dismiss be granted because, as a department of the State of Michigan, it also is absolutely immune from suit under the Eleventh Amendment. *See, e.g., Turnboe v. Stegall*, No. 00-1182, 2000 WL 1679478, at *2 (6th Cir. Nov. 1, 2000); *Erdman v. Mich. Dep't of Corr.*, No. 94-2109, 1995 WL 150341, at *1 (6th Cir. Apr. 5,

1995); *Cullens v. Bemis*, No. 92-1582, 1992 WL 337688, at *1 (6th Cir. Nov. 18, 1992); *Adams v. Mich. Dep't of Corr.*, No. 86-1803, 1987 WL 36006, at *1 (6th Cir. May 7, 1987).

### 3. Individual Capacity Claims

#### a. Qualified Immunity

Defendants assert that they are entitled to qualified immunity from the claims brought against them in their individual capacities because Plaintiff has failed to demonstrate that any of them committed an acted that violated clearly-established federal rights of which a reasonable person would have known. (Doc. 18, Br. in Supp. at 7.)

Qualified immunity provides that government officials acting within their discretion are generally shielded from liability for civil damages as long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). To determine whether a defendant is entitled to qualified immunity, a court considers: (1) whether the defendant violated a constitutional right; and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). The Supreme Court explained, however, that "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*; *see also Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007) ("If there is no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law and the defendant . . . does not need qualified immunity.").

#### b. Retaliatory Transfer Claim

Plaintiff alleges that after he raised concerns about the grievance procedure and medical care during a JCF warden's forum meeting, he was retaliated against in the form of being

transferred to the MDOC's Lakeland facility. (Compl., Doc. 1 at 56 ¶ 97.) This allegation is found within the section of his Complaint setting forth a cause of action against Defendant Warden Scutt, but Plaintiff does not allege that Defendant Scutt or any other particular defendant was responsible for the transfer. Instead, he generically states repeatedly that "Movant was removed from the facility," "Movant was transferred," and "Movant . . . was told by staff, that up front, put Movant on an Emergency ride out." (*Id.*)

A First Amendment retaliation claim consists of the following elements: (1) the plaintiff was engaged in constitutionally-protected conduct; (2) the defendant's adverse action would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between elements one and two, i.e., the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999) (en banc); *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004). The Sixth Circuit has held, however, that

> a transfer to another institution "does not constitute an adverse action since a transfer is merely an ordinary incident of prison life." *See Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005). As such, an alleged retaliatory transfer ordinarily "should be characterized as *de minimis* and dismissed at the summary judgment stage." *Id.* at 703. In *Siggers-El*, we carved out an exception for cases in which foreseeable, negative consequences "inextricably follow" from the transfer – such as the prisoner's loss of his high-paying job and reduced ability to meet with his lawyer. *Id.* at 701-02. In these exceptional cases, "'[w]hether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact.'" *Id.* at 703-04 (alteration in original) (quoting *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002)).

*Jones v. Caruso*, No. 10-1515, 2011 WL 1586075, at *3 (6th Cir. April 28, 2011).

I first suggest that Plaintiff's retaliatory transfer claim is subject to dismissal because Plaintiff has not alleged that Defendant Scutt, let alone any other particular defendant, made the decision to transfer him because he engaged in protected speech. *See Rizzo v. Goode*, 423 U.S. 362,

371-72, 377, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976) (a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant). Instead, he claims that he was "removed from the facility" after a warden's forum meeting, but he does not allege that any particular defendant initiated or approved his transfer.

I further suggest that the retaliatory transfer claim is subject to dismissal for failure to state a claim because Plaintiff has not alleged that any foreseeable, negative consequences inextricably followed from his transfer, such as the loss of a high-paying job or reduced ability to meet with his lawyer, as required to meet the exception carved out by *Siggers-El*. Accordingly, because Plaintiff's claim fails to show a constitutional violation, there is no need for further inquiries into the doctrine of qualified immunity.  *See Saucier*, *supra*.

### c.      Defendants Caruso and Scutt

Plaintiff asserts that Defendant Caruso's "duty is to make sure policy is followed, inmates are protected, [and that] inmates receive proper care and medical treatment," but that Director Caruso "has failed to do this or even inquire into the neglect, allowing these actions to occur." (*Id.* ¶ 31.) Plaintiff states that he "sent letters and grievances, but [Director Caruso] refused to acknowledge [Plaintiff] or his concerns." (*Id.* ¶ 32.) Plaintiff alleges that Director Caruso "oversees the day to day operations" of the MDOC, and therefore she is "fully aware that adequate medical attention is not being given, but yet fails to do anything to stop the neglect and is simply turning a blind eye, just to save money." (*Id.*)

With regard to Defendant Warden Scutt, Plaintiff alleges that while she was conducting rounds, he attempted to ask the warden questions about his medical care and the grievance process, and she merely responded that he should "follow the grievance procedure" and should take up his

concerns about his medical care with the medical staff or file a grievance. (*Id.* at 54 ¶¶ 93-94.) Plaintiff asserts that "it was her responsibility to see that my needs were meet [sic], and all violations that were taking place were dealt with properly," including grievances and medical issues. (*Id.* ¶ 95.)

I suggest that Plaintiff's allegations fail to state a claim against Defendants Caruso and Scutt in their personal capacities because Plaintiff has not alleged that these defendants personally took any actions that were in violation of Plaintiff's rights. In a civil rights case, a plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948. *See also Rizzo v. Goode*, 423 U.S. 362, 371-72, 377, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976) (a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant).

In this case, Plaintiff asserts that Defendant Caruso was aware that adequate medical attention was not being given, but failed to do anything to stop the neglect (Compl., Doc. 1 ¶ 32), and that Defendant Scutt failed to answer his questions satisfactorily and to make sure his needs were met. (*Id.* ¶ 95.) Liability under § 1983, however, must be based on active unconstitutional behavior. *Green v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). In addition, to the extent Defendants Caruso and Scutt were named individually because of their supervisory roles as the director of the MDOC and the warden of the facility where Plaintiff resided, I suggest dismissal is still required because a supervisor cannot be held liable absent a showing that the supervisor personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly unconstitutional conduct. *See, e.g., Leach v.*

*Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir. 1982).

Accordingly, because Plaintiff's claims against Defendants Caruso and Scutt fail to show a constitutional violation, there is no need for further inquiries into the doctrine of qualified immunity, pursuant to *Saucier*.

### d.   Defendant McMillan

Defendant McMillan is the grievance coordinator at JFC. Plaintiff lists in his complaint 28 separate and distinct grievances he filed at JFC during 2009 and 2010. (Compl. at 17-18.) Plaintiff alleges, however, that it was "hit or miss as to what grievances would or would not be processed." (*Id*. at 58 ¶ 98.) Plaintiff avers that when he asked Defendant McMillan about this, he responded that he was a little behind because the warden had him doing too many jobs. (*Id*.) Plaintiff claims that Defendant McMillan also reminded him that, according to the Policy Directive, if no response is received to a certain grievance, it is the inmate's responsibility to continue to the next step. (*Id*.)

He asserts that in response to his grievances, he received "nothing in the way of real help or answers" to his "questions of lack of medical and budget cuts concerning medical and their denial of medical procedures." (*Id*. at 59 ¶ 101.) Finally, Plaintiff makes the allegation that the "retaliatory acts of [Defendant] McMillan placed [Plaintiff's] life in danger many times, along with years of severe pain, that could have been avoided." (*Id*. at 60 ¶ 104.)

Defendant McMillan moves for dismissal of the claims against him on the grounds that prisoners have no constitutional right to any effective grievance procedures or access to any such procedure, and therefore Petitioner's allegations fail to state a cognizable claim. (Doc. 18, Br. at 10.) In response to the motion, Plaintiff reiterates his view that Defendant McMillan is "directly

responsible and in violation to date for non-processed grievances" and that McMillan "chose not to follow policy, procedure and rights, even though he was well aware as to what was taking place." (Doc. 28 at 13.)

I suggest that Defendant McMillan's motion to dismiss the claims against him be granted. "All circuits to consider this issue have also found that there is no constitutionally protected due process right to unfettered access to prison grievance procedures." *Walker v. Michigan Dep't of Corr.*, 128 Fed. Appx. 441, 445 (6th Cir. 2005) (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Young v. Gundy*, 30 Fed. Appx. 568, 569-70 (6th Cir. 2002). Therefore, a failure to follow the grievance procedures does not give rise to a § 1983 claim. *See also Sweeton v. Brown*, 27 F.3d 1162, 1165 (6th Cir. 1994) (en banc) (Michigan prison regulations do not create federal due process rights and are not actionable under § 1983).

Furthermore, the Sixth Circuit has held that claims against a corrections official for their response (or lack of response) to a grievance are not cognizable in a prisoner civil rights suit:

> The mere denial of a prisoner's grievance states no claim of constitutional dimension. *See Martin v. Harvey*, No. 00-1439, 2001 WL 669983, at *2, 14 Fed. Appx. 307 (6th Cir. June 7, 2001) ("The denial of the grievance is not the same as the denial of a request to receive medical care."); *see also Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) ([as against defendants whose only involvement was the denial of administrative remedies], [t]here is no allegation that any of these defendants directly participated . . . in the claimed . . . acts . . . .").

*Alder v. Correctional Medical Services*, 73 Fed. App'x 839, 841 (6th Cir. 2003).

Finally, with regard to Plaintiff's claim that Defendant McMillan's "retaliatory acts" placed Plaintiff's life in danger, Defendant McMillan moves for dismissal because of the conclusory nature of the one-sentence allegation. The Court agrees with Defendant. Plaintiff has not identified the conduct he claims to have been retaliatory, let alone alleged that the conduct was motivated

by Plaintiff's constitutionally-protected actions, as required by *Thaddeus-X*, 175 F.3d at 395. "[I]n the context of a civil rights claim, . . . conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim." *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996).

Accordingly, I suggest that the motion to dismiss be granted with regard to all claims brought against Defendant McMillan because Plaintiff has failed to state a claim upon which relief can be granted. Again, because Plaintiff's claims against Defendant McMillan fail to show a constitutional violation, there is no need for further inquiry into the doctrine of qualified immunity. *See Saucier, supra*.

### e.    Defendant Nurses Cindy Murphy & Karen Hamblin

Plaintiff alleges that these defendants violated his Eighth Amendment rights.

### i.    Governing Law

An Eighth Amendment violation occurs when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Estelle v. Gamble*, 429 U.S. 97,104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). "[M]edical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference," *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843–44 (6th Cir. 2002) (internal quotation marks and citation omitted), but not every claim of inadequate medical treatment qualifies as an Eighth Amendment violation. *Estelle*, 429 U.S. at 105. The Supreme Court has explained that

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must

allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Deliberate indifference occurs when a prison official: (1) subjectively perceives facts from which can be inferred a substantial risk to a prisoner's health or safety, (2) draws that inference, and (3) then disregards that risk. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical treatment, however, are insufficient to state an Eighth Amendment claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995).

### ii.       Claims Relating to September 16, 2009

Defendants have provided under seal Plaintiff's Certified Health Record, which is 493 pages long and spans the time period of January 2008 through November 2010. All of Plaintiff's claims against Defendants Murphy and Hamblin relate to incidents that occurred on three dates: September 16, 2009; September 18, 2009; and October 5, 2009. These will be addressed in chronological order.

#### *Record Evidence*

On September 16, 2009, Plaintiff was seen by JCF health care at 8:09 p.m. (Doc. 19 at 233.) Plaintiff's Treatment Record, which was completed by Nurse Vicki Carlson, states that he had

> called healthcare stating he felt like he was going to pass out when he was sitting at the table. Caught self falling backwards, did not fall. Ears felt real warm. Inmate's heartrate elevated [118 bpm], but alert and oriented. When RN Upston had him perform a valsalva maneuver, his heartrate went down to 96. Told inmate to drink plenty of fluids, rest, let us know if he has any more symptoms. Will ask to have him followed up by MSP [Medical Service Provider] in next couple of days. Verbalized understanding, left without complaint.

(*Id.*)

#### *Allegations*

14

Plaintiff alleges that on September 16, 2009, he went to health services regarding "losing consciousness." (Compl., Doc. 1 at 62 ¶ 105.) He claims that he was seen by an unknown nurse who wanted to send him to the hospital after discovering that his heart rate was 165 beats per minute. (*Id*.) Plaintiff alleges that Defendant Nurse Cindy Murphy stated, "no we are not sending him or anyone else anywhere. He just needs to drink more water, and hold his breath." (*Id*.) He claims that Defendant Murphy told him to go back to his unit and that he would be able to see a doctor the following day, but he was not seen by a doctor the following day. (*Id*.)

### *Discussion*

In support of her motion for summary judgment, Defendant Murphy has supplied an affidavit wherein she avers that she did not see Plaintiff on September 16, 2009, but that he was seen by a different nurse. (Murphy Aff., Doc. 18, Ex. B ¶ 4.) She points to the medical record quoted above as support of her averment. (*Id*.) Further, she states that she lacks the authority to decide whether an inmate is sent to the hospital. (*Id*. ¶ 5.) Finally, she denies making the statements Plaintiff attributes to her. (*Id*.)

I suggest that Defendant Murphy's motion for summary judgment on this claim be granted. Defendant Murphy has averred that she was not the nurse that saw Plaintiff on September 16, 2009, and Plaintiff's Certified Health Record supports her statement. She also has provided an affidavit stating that she has no authority to determine whether to send Plaintiff to the hospital, as he has alleged. Thus, she has met her burden of showing that there is no genuine issue of material fact with regard to Plaintiff's claims that she was deliberately indifferent to his serious medical needs on that date. *Street*, 886 F.2d at 1479. In his response, Plaintiff has not satisfied his obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore*, 8 F.3d at 339-40. Instead, he restates his

15

general argument that "Murphy [and the other defendants] are directly involved with violating Plaintiff's constitutional rights and denying much needed serious medical care, which has been clearly outlined in the complaint and outlined in grievances and letters." (Doc. 28 at 13.)

Accordingly, with regard to the claim that Defendant Murphy violated Plaintiff's Eighth Amendment rights on September 16, 2009, I suggest that summary judgment be granted to Defendant Murphy because the evidence is "so one-sided that one party must prevail as a matter of law." *Booker,* 879 F.2d at 1310.

### iv.    Claims Relating to September 18, 2009

Plaintiff claims that two days later, both Defendant Nurse Murphy and Defendant Nurse Hamblin violated his Eighth Amendment rights.

#### *Allegations*

Plaintiff claims that on September 18, 2009, he was seen by Physician's Assistant Jackson, who concluded that Plaintiff needed to go to the hospital immediately, but that the PA was overruled by Dr. Stevenson, who "declined the spending." (Compl., Doc. 1 at 37 ¶ 53.) Later that evening, Plaintiff states that he "started having chest pains related to earlier in the day," and so he went to health care, where he was verbally abused and "chastised" by Defendant Nurses Karen Hamblin and Cindy Murphy for 15 minutes. (*Id*. at 38 ¶ 55.[2]) Defendant Hamblin then took Plaintiff's vital signs and called a doctor at another facility in Ionia, Michigan. (*Id*. at 39 ¶ 56.) The doctor instructed the nurses to give Plaintiff some nitroglycerine, wait five minutes, and check his heart rate again. Plaintiff reports that Defendant Nurse Hamblin "checked pulse again and the rate was 134 and rising, with Arrhythmias." (*Id*.) Plaintiff states that the doctor from the Ionia facility instructed that Plaintiff be taken to the hospital. (*Id*. ¶ 57.) Plaintiff alleges that he was left waiting

---

[2]Plaintiff restates these allegations in paragraphs 142-46 of the Complaint.

16

for over 40 minutes[3] before being transported to the hospital. (*Id.* ¶ 58.) He also alleges that the doctor had wanted him to be transported by ambulance, but Defendant Hamblin told the doctor, "we can send him by car, it will be quicker, as the hospital is right down the street." (*Id.* ¶ 144.) Plaintiff claims that after he was at the hospital, his treatment was delayed because Defendant Hamblin had not sent the necessary paperwork. (*Id.* ¶ 146.)

### Record Evidence

Plaintiff's Certified Health Record shows that he was seen by Physician's Assistant Latoya Jackson at 1:10 p.m. (Doc. 19 at 234.) Plaintiff reported that he was having palpitations, was fatigued, and felt extremely warm, but denied any headache, dizziness, chest pain, shortness of breath, or cough. (*Id.*) PA Jackson's assessment was that Plaintiff had "resting tachycardia with questionable brief syncopal episode." (*Id.* at 235.) Plaintiff was to be monitored at JCF and was "instructed to return to clinic immediately if he has worsening in current symptoms, or development of chest pain, [shortness of breath, or] lightheadedness." (*Id.*)

Plaintiff returned to health care at 8:36 p.m. that evening, complaining of "heavy pressure in chest – dizziness – family history of cardiac disease – pain relieved by rest." (*Id.* at 238.) The "Nurse Protocol" for "Chest Pain" was completed by Defendant Nurse Hamblin. (*Id.*) At 9:08 p.m., Defendant Hamblin noted that

> Dr. Edelman contacted and he ordered to give inmate 30 ml of mylanta to see if relieved pressure. He also ordered to try NTG sublingual. Mylanta did not relieve pressure but 1 NTG did. Called Dr. Edelman back and informed him of relief of pressure so he instructed that inmate could go to Allegiance ER by state car.

(*Id.* at 240.)

---

[3]In paragraph 145 of the Complaint, Plaintiff states that the time he had to wait before being transported to the hospital was more than an hour.

The Allegiance Health Emergency Care record shows that Plaintiff arrived at 10:32 p.m. and was "asymptomatic." (*Id*. at 241.) The record states:

> 41-year-old causasian male brought with complaints of palpitations and chest pain. Patient has had palpitations for the past 3 days. He states that three days ago he had palpitations and a syncopal episode. No treatment was started. For the past three days he has had a feeling of palpitations with no other symptoms. Today he had a feeling of dull, moderate chest pain occurring substernally and radiating to his jaw and his left arm. The pain was treated with a nitroglycerine sublingually and it resolved. He has had no chest pain since that time. . . . Patient is now asymptomatic and feeling fine.

(*Id*.) Blood work and xrays were done, and Plaintiff was discharged at 2:52 a.m. (*Id*. at 245.) His discharge instructions stated that his "exam and tests have not identified a specific cause for your chest pain. This type of pain, however, is not usually due to serious heart or lung problems." (*Id*. at 247.) The discharge instructions also states that heart palpitations "may cause frightening symptoms such as feeling the heart is skipping a beat or racing," but these abnormal heart rhythms "are typically benign and not a sign or heart disease or other serious medical problems." (*Id*. at 248.) Plaintiff was instructed to "[a]rrange for a follow up appointment with the health care provider at the prison immediately if your symptoms recur or get worse." (*Id*. at 247.)

### *Discussion*

Defendants move for summary judgment, arguing that the record reveals that Plaintiff was provided with consistent examinations, diagnostic testing, and medications to address his medical needs, which belie any contention of deliberate indifference. (Doc. 18, Br. at 14.)

Plaintiff claims that Defendants Murphy and Hamblin verbally abused him and delayed his medical treatment on September 18, 2009. The Sixth Circuit has long held that verbal abuse or threats do not amount to a constitutional violation. *Ivey v. Wilson*, 832 F.2d 950, 954-55 (6th Cir. 1987). With regard to a delay in medical treatment, the Supreme Court has held that denying or

delaying access to medical care can constitute deliberate indifference. *Estelle*, 429 U.S. at 104-05. However, when a plaintiff brings a claim for delay in medical treatment, he must allege that the delay had a detrimental effect. *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001) ("an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed").

In this case, not only has Plaintiff not met the burden of placing verified medical evidence in the record establishing the detrimental effect of the delay, but the record evidence reveals that from the time Defendant Hamblin gave him nitroglycerine between 8:36 p.m. and 9:08 p.m., he had no further chest pains or symptoms. Further, the hospital discharge papers stated that no serious medical problem had been identified. (Doc. 19 at 247-48.) Accordingly, I suggest that Defendants Murphy and Hamblin are entitled to summary judgment on Plaintiff's claims that they violated his Eighth Amendment rights on September 18, 2009.

### v.    Claims Relating to October 5, 2009

Plaintiff claims that Defendant Nurse Murphy violated his Eighth Amendment rights on October 5, 2009. (Compl., Doc. 1 at 63 ¶ 109.)

### *Record Evidence*

Plaintiff's health record shows that on October 5, 2009, at 7:35 a.m., Plaintiff was seen by Nurse Michelle Creger because he had hives due to an allergic reaction to a beta-blocker medication. (Doc. 19 at 270.) Nurse Creger noted that Plaintiff had been seen the previous evening by nursing and had been given a Benadryl injection. (*Id*.)

A few hours later, at 11:32 a.m., Plaintiff was seen by Physician's Assistant Adrianne Neff. (*Id*.) PA Neff noted:

> Patient with hives seen. Presumed beta blocker (Lopressor) allergy. This was added to patient's record. Benadryl and steroid shots ordered. F/U appt with primary MSP already made.

(*Id.*)

Later that evening, at 7:29 p.m., Plaintiff went back to health care and was seen by Defendant Nurse Murphy, who made the following progress note in the medical record:

> Pt came to healthcare and was asked what shot he got. He went on about his feet being swollen and needing shoes and nurse stopped him and asked him what shot he was to get. He was angry that nurse didn't know his circumstances and stated, "[I]'ll take this bullshit up with the Dr. tomorrow["] and started to leave. He was asked to come back so nurse could look up what had happened before and he refused. Left in a huff. He didn't appear that he was having any breathing problems and was unable to see if he still has hives d/t his leaving abruptly. Per computer there is a one time order for depomedrol and benadryl earlier today. There are no f/u shots seen.

(*Id.* at 272.)

The following day Plaintiff was seen by Dr. Vemuri for follow up on his skin rash due to Lopressor. (*Id.* at 273.) Dr. Vemuri noted, "Lopressor was discontinued and norvasc was started recently. Denies symptoms and signs of distress. No other complaints." (*Id.*)

### *Allegations*

Plaintiff alleges in his Complaint that on October 5, 2009, he went to health care and, upon arriving, he began informing Defendant Murphy as to what had been taking place with his medical care over the past few days. (Compl., Doc. 1 at 63 ¶ 109.) He claims that Defendant Murphy cut him off, raised her voice, and stated, "I don't want to hear it. You can put that in a kite and can wait to be seen another day." (*Id.*) Plaintiff states that he "turned to walk away, to avoid confrontation or the possibility of being locked in isolation or having a problem with the Corrections Officers." (*Id.*) Plaintiff reports that as he was going out the door, Defendant Murphy yelled down the hall for Plaintiff to "come back here," but he stated, "I will not come back, [for]

fear that RN Murphy would say [Plaintiff] had done or said something and have him placed in isolation . . . ." (*Id.*) Plaintiff claims that later that day "Sgt. John Do" stated that Nurse Cindy "should not be working in health care, just useless." (*Id.* ¶ 110.) He further asserts that later that night he became "so swelled that his limbs started ripping open and bleeding," and that he could only crawl a few feet, but could not stand or walk. (*Id.* ¶ 111.)

### *Discussion*

Defendant Murphy asserts that she is entitled to summary judgment because Plaintiff acknowledges that he walked off in a huff without giving her an opportunity to examine him or treat him on October 5, 2009. (Doc. 18, Br. at 14.) Defendant argues that, having declined further treatment, he cannot now claim that he was denied treatment. (*Id.*)

I suggest that Defendant Murphy's motion for summary judgment be granted on this claim. Plaintiff had been seen by health care twice on the morning of October 5, 2009, had received treatment, and he admits that he turned and walked out prior to receiving any treatment that evening. He further admits that Defendant Murphy asked him to come back and he refused. In addition, he was seen again the following day by a doctor who noted that he had no signs of distress. (Doc. 19 at 273.)

Liability for deliberate indifference exists "only if [the defendant] knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). I suggest that, after walking out of health care and refusing to return, Plaintiff cannot now claim that Defendant Murphy was deliberately indifferent to a substantial risk of serious harm. Accordingly, I suggest that summary judgment be granted to Defendant Murphy because the evidence is "so one-sided that one party must prevail as a matter of law." *Booker,* 879 F.2d at 1310.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗
CHARLES E. BINDER
Dated: July 21, 2011                                        United States Magistrate Judge


### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Ronald Chapman, Kimberley Koester and Thomas Leonard; and served by first class mail on Brian Courtney, #444293, Lakeland Correctional Facility, 141 First St., Coldwater, MI, 49036.

Date:  July 21, 2011                      By     s/*Jean L. Broucek*
                                          Case Manager to Magistrate Judge Binder